THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| KHALID MOURTAGA, et al., | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 24 C 13038 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| et al. | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a group of U.S. citizens and lawful permanent residents ("LPR") representing either themselves or their immediate family members, seek an order from the Court compelling the President of the United States, the Secretary of State, and the Secretary of Defense to "coordinate the emergency evacuation of Plaintiffs and others" from the Gaza Strip. (*See* Dkt. 1 at 30). Because resolving Plaintiffs' two-count Complaint would require the Court to evaluate the executive branch's delicate foreign policy decisions without any judicially discoverable standards, jurisdiction is lacking. Accordingly, Defendants' Motion to Dismiss [20] is granted.

## BACKGROUND

### I.  Factual Allegations

Plaintiffs are a collection of nine U.S. citizens and LPRs of Palestinian origin. At the time their Complaint was filed, three of them were stranded in Gaza.[1] (*See* Dkt. 1 ¶¶ 12–13, 20). The

---

[1] As of June 3, 2025, the date on which this Court heard oral argument on Plaintiffs' Motion for Preliminary Injunction, only one of the Plaintiffs remained in Gaza, Salsabeel ElHelou. (Dkt. 34 at 61:9–13 (Hearing Transcript)). The Court has not received any further updates from the Plaintiffs since June on ElHelou's current location, or the locations of the remaining Plaintiffs' family members who were stranded in Gaza.

remaining six were safely in the United States but seeking relief on behalf of their spouses, parents, children, and siblings who remained in the war zone. (*Id.* ¶¶ 14–19). Plaintiffs allege a series of harms flowing from the ongoing humanitarian crisis in Gaza and the U.S. government's failure to evacuate them to safety.

After Hamas killed more than 1,000 people in southern Israel on October 7, 2023, Israeli Prime Minister Benjamin Netanyahu declared Israel was at war. Retaliatory airstrikes into Gaza began almost immediately, followed by a full-scale ground invasion. On October 11, 2023, the U.S. Department of State declared Gaza "unsafe" and warned U.S. citizens not to travel there. (Dkt. 1 ¶ 34). The next day, President Joe Biden's National Security Communications Advisor indicated that, although evacuation efforts for Americans stranded in Israel were ongoing, those in Gaza could not leave. (*Id.* ¶ 38). Eventually, the State Department made a "crisis intake form" available on its website for U.S. citizens, their spouses, unmarried children under the age of 21, parents, and siblings under the age of 21, along with LPRs, their spouses, and unmarried children under the age of 21 who were in Gaza. (*Id.* ¶¶ 39–40). The purpose of the form was to identify individuals in need of assistance, determine where in Gaza they were located, and confirm their eligibility for evacuation. (*Id.* ¶ 41). Each of the Plaintiffs and their eligible family members completed the intake form. (*Id.* ¶ 39). After completing the form, all the Plaintiffs could do was wait for the State Department to contact them about whether and when they could leave. (*Id.* ¶¶ 42–46).

In the months that followed, many U.S. citizens were cleared to leave Gaza via the Rafah border crossing into Egypt. (*Id.* ¶ 44). Others received evacuation clearance and instructions to rendezvous with government officials and aid workers at a hospital in Gaza, after which they would be transported through Israel and into Jordan—where they could eventually board flights to the

United States. (*See, e.g.*, Dkt. 34 at 25:12–26:13). Some of these people left Gaza. Others were approved for evacuation, but chose to stay because one or more of their immediate family members were not approved. For example, Plaintiff Salsabeel ElHelou was included on the Rafah crossing list on March 22, 2024, along with her seven- and twelve-year-old children. (*Id.* ¶¶ 128, 130). But her fifteen-year-old son was not, leaving ElHelou with "no choice but to remain in Gaza to avoid separation." (*Id.*) ElHelou's story is not particularly unique, even among the relatively small class of Plaintiffs. (*See, e.g.*, Dkt. 34 at 22:4–12, 24:12–23).

Those Americans who have either not been cleared to leave Gaza—or who have decided to stay behind until their immediate family members are also cleared—have faced extraordinary hardship. Their homes have been destroyed, forcing them to live in crowded tent cities that have often been the targets of Israeli airstrikes. (*See* Dkt. 1 ¶¶ 117, 119). Food shortages have placed them on the "brink of starvation." (*Id.* ¶¶ 85, 99). Strains on the medical system have left them without needed blood pressure and diabetes medication, or treatment for significant health conditions. (*See id.* ¶¶ 105, 110). And the years of fighting has left others dead, like Plaintiff Sahar Harara's father. (*Id.* ¶ 90.) In addition to the physical trauma these Plaintiffs have endured, the mental anguish that accompanies that trauma is virtually unimaginable.

The Plaintiffs allege that in the face of this danger, harm, and death, the United States government has turned its back on them based on their Palestinian national origin and in dereliction of a "mandatory, non-discretionary duty to evacuate Palestinians from Gaza." (*Id.* ¶¶ 137–42).

## II. Procedural History

Plaintiffs filed their two-count Complaint on December 19, 2024. (Dkt. 1). Count One alleges Defendants have violated the Equal Protection Clause of the Fifth Amendment in that they have steadfastly evacuated Americans of different nationalities from comparable conflict zones

while denying Palestinian Americans that same relief. (*See* Dkt. 1 ¶¶ 143–54). According to Plaintiffs, Defendants have "created a two-tier system sending a clear signal about the prioritization of its citizens, effectively endorsing discriminatory policies that disproportionately disadvantage Palestinian Americans." (*Id.* ¶ 147). Count Two of Plaintiffs' Complaint alleges that the Defendants' failure to evacuate all Palestinian Americans from Gaza violates the Administrative Procedures Act. 5 U.S.C. § 706(2)(A); (Dkt. 1. ¶ 155–66). They argue there is a "specific mandatory directive that requires Defendants to protect and evacuate Plaintiffs and other United States citizens stranded in Gaza," that Defendants' failure to act constitutes a "final agency action," and that the government's conduct is "willful, arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and . . . unlawful." (Dkt. 1 ¶¶ 158–59, 161). On March 6, 2025, Plaintiffs moved for a preliminary injunction. (Dkt. 16). Both Plaintiffs' Complaint and Motion for Preliminary Injunction seek a declaratory judgment from the Court finding the Defendants have failed to fulfill their nondiscretionary evacuation duties and that those failures constitute an equal protection violation, along with an injunction requiring Defendants to "coordinate the emergency evacuation of Plaintiffs and others in Gaza." (Dkt. 1 at 30; Dkt. 16 at 6–7). The Court heard oral argument on Plaintiffs' Motion for Preliminary Injunction on June 3, 2025, during which several of the Plaintiffs testified. (*See generally* Dkt. 34).

Defendants moved to dismiss Plaintiffs' Complaint in its entirety on March 20, 2025. (Dkt. 20; Dkt. 21). They contend there are at least three reasons compelling dismissal. First, Plaintiffs' case raises nonjusticiable political questions that have been "constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); (Dkt. 21 at 5–8). Second, that Plaintiffs lack standing to pursue their requested relief. (Dkt. 21 at 8–10). And third, even if Plaintiff can

4

overcome these threshold inquiries, they still fail to state any claims upon which relief can be granted. (*Id.* at 10–14).

## LEGAL STANDARD

The political-question doctrine implicates this Court's jurisdiction to hear a case at all, and is appropriately analyzed under Fed. R. Civ. P. 12(b)(1). *Judge v. Quinn*, 624 F.3d 352, 357–58 (7th Cir. 2010) (noting political-question doctrine claims "affect[] our jurisdiction and cannot be forfeited"); *see also Mobarez v. Kerry*, 187 F. Supp. 3d 85, 89 (D.D.C. 2016) (Brown Jackson, J.). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The party invoking jurisdiction always bears the "burden of showing its existence." *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 634 (7th Cir. 2021). In determining whether jurisdiction exists, the court looks "beyond the jurisdictional allegations of the complaint and consider[s] any evidence submitted on the issue." *Farnik v. F.D.I.C.*, 707 F.3d 717, 721 (7th Cir. 2013).[2]

The Defendants also move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a plaintiff's complaint must contain allegations that plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must construe the complaint "in a light most favorable to the nonmoving party, accept well-

---

[2] While the government is correct that the June 3, 2025 hearing was on Plaintiffs' Motion for Preliminary Injunction, (Dkt. 34 at 66:1–6), to the extent evidence from that hearing bears on the jurisdictional questions at issue case, the Court will consider that evidence, even if missing from the operative pleading.

pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). "Legal conclusions or bare conclusory allegations, however, are insufficient to state a claim." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678, 680).

## <u>DISCUSSION</u>

Plaintiffs seek an order from this Court directing the executive branch to immediately facilitate the evacuation of any U.S. citizen, LPR, and eligible family member who remains in Gaza. The Defendants' leading argument in opposition to this broad and extraordinary request for relief is that the Plaintiffs' claims present nonjusticiable issues under political-question doctrine. Because the Court agrees, it does not proceed to Defendants' remaining arguments favoring dismissal or to the merits of Plaintiffs' Motion for Preliminary Injunction.

Article III of the Constitution vests this Court with the power to resolve all cases and controversies arising under the Constitution and laws of the United States. U.S. Const. art. III, § 2. But there are several limits on this power. For example, the Court can only exercise its Article III power in situations where Congress has explicitly conferred jurisdiction. *Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922). Plaintiffs must also have "standing," or a "personal stake" in a case before the Court can weigh in on the merits. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The Court's Article III power is also limited in more structural ways including by the separation of powers between the executive, legislative, and judicial branches. While it is not often that Article III conflicts with the separation of powers, the Supreme Court has long recognized that there is a narrow category of claims that the federal judiciary is incapable of resolving based on their tendency to encroach upon the powers of coequal branches.

The political-question doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government." *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). But its boundaries must be strictly enforced based on the judiciary's "responsibility to decide cases properly before it, even those it 'would gladly avoid.' " *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). "A controversy is nonjusticiable" when the issue presented in a plaintiff's case involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). If either one of these two factors are "[p]rominent on the surface of any case," the Court must not proceed. *Baker*, 369 U.S. at 217; *see also Mobarez*, 187 F. Supp. 3d at 91; *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (noting the Court "need only conclude that one factor is present, not all").

Sensitive foreign policy decisions are "committed by the Constitution to the executive and legislative departments—'the political' departments of the government and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decisions." *Flynn v. Shultz*, 748 F.2d 1186, 1190 (7th Cir. 1984) (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918)). But that is not to say that all cases, claims, or questions that touch on foreign affairs are incapable of judicial review. "The Supreme Court in *Baker* clearly required a 'discriminating inquiry into the precise facts and posture' of each case and stated that 'it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance.' " *Flynn*, 748 F.2d at 1190 (quoting *Baker*, 369 U.S. at 211). A question's justiciability on foreign policy grounds often turns on whether the plaintiff's claim calls for garden variety

statutory analysis or instead would demand a judicial veto of discretionary policy decisions. As Plaintiffs rightly observe, claims requiring a determination on whether "taking military action was wise" stand in stark contrast to those "presenting purely legal issues." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010); (Dkt. 16 at 15).

Plaintiffs argue this case is governed by an unambiguous statutory and policy scheme and, thus, straightforward legal analysis is all that is required to resolve it. (*See* Dkt. 16 at 15 ("The statute that establishes Defendants' duty to evacuate Plaintiffs is unambiguous.")). The relevant scheme is comprised of one statute, one executive order, and one Memorandum of Agreement between the Departments of State and Defense. (*See* Dkt. 1 ¶¶ 24–33). Title 22 U.S.C. § 4802(b) provides that "[t]he Secretary of State shall develop and implement policies and programs to provide for the safe and efficient evacuation of United States Government personnel, dependents, and private United States citizens when their lives are endangered." A 1988 Executive Order directs the Secretary of State to "carry out Department of State responsibilities in the conduct of the foreign relations of the United States during national security emergencies, under the direction of the President . . . including, but not limited to . . . [p]rotection or evacuation of United States citizens and nationals abroad," and the Secretary of Defense to "[a]dvise and assist the Secretary of State . . . as appropriate, in planning for the protection, evacuation, and repatriation of United States citizens in threatened areas overseas[.]" Exec. Order No. 12656, 53 Fed. Reg. 47491, 47503–04 (Nov. 18, 1988). Finally, the Memorandum of Agreement between State and Defense states it is the "policy of the United States Government" to evacuate U.S. citizens and nationals "when necessary and feasible," and to "[r]educe to a minimum" the number of U.S. nationals in "probable or actual combat areas." (Ex. A, Dkt. 21-1 at 2).

The central problem with Plaintiffs' position is that they cannot point to any language in § 4802, E.O. 12,656, or the memorandum of agreement setting forth a clear and unambiguous command. Instead, executive discretion is plainly baked into each. For example, § 4802 does not require the Secretary of State to evacuate all U.S. citizens and their family members from areas where their lives are in danger within a certain amount of time. (*See* Dkt. 34 at 55:14–18 ("[I]f I had a law that said . . . the U.S. government must evacuate . . . a U.S. citizen in a war zone, and they must have their whole family evacuated together, we would have a legal decision to make.")). Instead, it only directs the Secretary to "develop and implement policies and programs" for evacuations, which shall include "assess[ing] the transportation and communications resources in the area being evacuated" and developing voluntary evacuation request mechanisms. § 4802(b)(2)–(3). And the joint memorandum of agreement is replete with conditional and discretionary phrases, indicating it is the official policy of the United States government to evacuate its citizens and other designated nationals only "when necessary and feasible." As then-Judge Ketanji Brown Jackson observed in a very similar case involving evacuation efforts for Americans stranded in Yemen, "it is clear to this Court that none of these provisions solves Plaintiffs' political-question problem, because none sets forth the kind of stark, obligatory action— *entirely* devoid of discretion." *Mobarez*, 187 F.3d at 96 (emphasis in original). As a result, Plaintiffs' claims inescapably call for an inquiry into the executive branch's discretionary foreign policy decisions.

Even assuming the government had some statutory or constitutional duty to evacuate all Plaintiffs from Gaza, analyzing its compliance with that duty would "require ascertainment of facts and standards of decision that are beyond judicial discovery and management." *Flynn*, 748 F.2d at 1193.

This case involves numerous facts not in evidence and questions to which neither the Court, nor the parties know the answer. *See id.* at 1192 (quoting *Holtzman v. Schlesinger*, 484 F.2d 1307, 1312 (2d Cir. 1973)) (recognizing dismissal under the political-question doctrine is often appropriate when a claim "involves diplomatic and military intelligence which is totally absent in the record before" the court). Many of these unknown facts and unanswerable questions were drawn to the fore at the June 2025 oral argument held in this case. How does the lack of a U.S. diplomatic presence in Gaza complicate evacuation procedures, especially compared to other overseas conflicts? (*See* Dkt. 34 at 64:22–25). What level of coordination with neighboring nation-states including Israel, Jordan, and Egypt is required to facilitate extraction efforts and flights back to the United States? (*See id.* at 45:18–22). What individual characteristics or other external factors are the State Department considering when determining that a U.S. citizen is cleared for evacuation, but that citizen's immediate family member is not? (*See id.* at 48:25–49:8). How many people can be shepherded through so-called "red zones"—where Palestinians are ordinarily instructed not to travel given extremely high risk of shelling—on a given day? (*See id.* Dkt. 45:18–46:1). Endeavoring to answer these questions—and many more like them—from the comfort of chambers is both undoable and would also invade the political branches' constitutionally committed tasks of determining when, how, and under what circumstances evacuations from war zones should proceed.

Moreover, the evidence that is available demonstrates the U.S. government *has* developed a program to coordinate evacuations from Gaza. Plaintiffs confirm in their Complaint that all of them were able to complete the State Department's crisis evacuation form. (Dkt. 1 ¶ 39). Khalid Mourtaga testified that, as early as December 2023, many Palestinian–Americans were being approved to exit Gaza via the Rafah Border Crossing, (Dkt. 34 at 19:19–25, 24:3–18); that the U.S.

government was routinely in contact with applicants for evacuation about upcoming opportunities to leave Gaza, (*id.* at 25:9–19); and that the U.S. government at times had to cancel, reschedule, or otherwise adjust evacuations based on unknown developments in the region, (*id.* at 31:2–32:25). Indeed, when the Court held oral argument in June 2025, every named Plaintiff had either been evacuated from Gaza or rejected a prior evacuation offer because an immediate family was not also approved. (*See id.* at 61:9–25). Again, there is no practical way for this Court to evaluate these efforts, weigh them against the statutory and constitutional obligations imposed on the executive, and issue a ruling on the merits of Plaintiffs' case.

These rationales apply with equal, if not greater, force to Plaintiffs' equal protection claim. Untethered to any statutory duty or official policy, that claim would require the Court to second-guess the discretionary evacuation decisions the U.S. government has made not just in Gaza, but also in Afghanistan, Lebanon, Sudan, Libya, and elsewhere, without access to the individualized facts underlying those foreign policy determinations. (*See* Dkt. 1 at 47–70); *cf. Sadi v. Obama*, 2015 WL 3605106 (E.D. Mich. June 8, 2015) (finding Yemeni-Americans failed to state an equal protection claim because they had not shown they were "similarly situated" to Americans evacuated from other conflict zones, or that the current conditions in Yemen were "similar to the conditions then-presented in those other countries").

One final point merits brief discussion—Plaintiffs' contention, based on the Supreme Court's recent decision in *Noem v. Abrego Garcia*. 145 S. Ct. 1017 (2025), that this Court need only order the government to "facilitate" the evacuation of all covered persons still in Gaza. (*See, e.g.*, Dkt. 34 at 52:25–53:9; Dkt. 29). This argument conflates Plaintiffs' requested remedy with their right to relief. As the court in *Mobarez* aptly concluded, it "makes no difference" in this context whether a plaintiff seeks an order directing the executive to take a specific course of

conduct or to merely facilitate their evacuation. *Mobarez*, 187 F. Supp. 3d at 93. When considering the sufficiency of evacuation procedures in foreign conflict zones, the relevant political-question doctrine hurdle has less to do with the relief sought and everything to do with the second-guessing of discretionary decisions the executive branch has already made (i.e., not to evacuate certain persons) that would be necessary to arrive at that relief. *See id.* It is this distinction between right and remedy that distinguishes Plaintiffs' case from Abrego Garcia's.

In *Abrego Garcia*, the Court upheld a district court's order requiring the U.S. government to "facilitate" Kilmar Armando Abrego Garcia's return to the United States after he was illegally removed to El Salvador. *Abrego Garcia*, 145 S. Ct. at 1018. Plaintiffs are correct that, to the extent the *Abrego Garcia* case raised any separation of powers problems at all, it was only insofar as the district court originally ordered the government to both "facilitate" and "*effectuate*" Abrego Garcia's return. *Id.* ("The intended scope of the term 'effectuate' in the District Court's order is, however, unclear, and may exceed the District Court's authority. The District Court should clarify its directive, with due regard for the deference owed to the Executive Branch in the conduct of foreign affairs."). But Plaintiffs' request for a similar form of relief that the Supreme Court in *Abrego Garcia* approved of only gets them so far because the posture of their case is completely different. *See Baker*, 369 U.S. at 217 (emphasizing the "necessity for discriminating inquiry into the precise facts and posture" of each political-question doctrine case). The underlying claim in *Abrego Garcia* involved the straightforward task of determining whether a noncitizen was unlawfully removed—a "familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196. Indeed, the government had even conceded that the removal was illegal. *Abrego Garcia*, 147 S. Ct. 1018. All that remained was the discussion of remedy. Here, by contrast, there have been no concessions on the legality of the U.S. government's action or inaction in Gaza. It is that threshold determination

of whether Plaintiffs have a right to relief in the first instance that is bound up with discretionary foreign policy decisions and, thus, nonjusticiable under the political-question doctrine. *See Zivotofsky*, 566 U.S. at 196 (distinguishing between cases that call for the court's "unmoored determination of what United States policy" should be toward foreign countries and those that simply seek enforcement of a "specific statutory right").

The executive branch, in coordination with foreign governments throughout the Middle East have made determinations about when evacuations from Gaza are practical, how they should be executed, and who should benefit on what timelines. Although the Court sympathizes with the impossible positions in which many of the Plaintiffs have found themselves, it does not have the power or the tools to review those determinations.

## **CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss [20] is granted, and Plaintiffs' Complaint [1] is dismissed with prejudice. Accordingly, Plaintiffs' Motion for Preliminary Injunction [16] is denied as moot.

Virginia M. Kendall
United States District Judge

Date: January 8, 2026